**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| REGINALD MERCHANT,<br>        Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION, LLC, AND, AMERICAN EXPRESS COMPANY,<br><br>        Defendants. | Civil Action No.:<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Reginald Merchant ("Plaintiff" or "Mr. Merchant"), a living, breathing 34-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"); Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and American Express Company ("American Express" or "AMEX") (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the

Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested

parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much

3

concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to

conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12. Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13. Plaintiff also brings a claim against Defendant American Express for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15.    Reginald Merchant ("Plaintiff" or "Mr. Merchant") is a natural person residing in Brooklyn Park, Minnesota, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of Minnesota, including within this District.

17.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

18.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at

6

2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Minnesota, including within this District.

19.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Defendant American Express Company ("Defendant AMEX" or "AMEX") is a multinational financial services corporation with a principal place of business located at 200 Vesey Street, Lower Manhattan, New York, NY 10285, and is authorized to do business in the State of Minnesota, including within this District.

21.     Defendant AMEX is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

24.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

25.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

26.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality,

accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

27.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

28.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The Credit Bureau Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

29.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

30.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

31.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

32.    The Credit Bureau Defendants routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

33.    The Credit Bureau Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

34.    The Credit Bureau Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

35.    The Credit Bureau Defendants do not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

36.   The Credit Bureau Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

37.   In some cases, in order to assure accuracy, the Credit Bureau Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. The Credit Bureau Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

38.   The Credit Bureau Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by social security number those consumers that the government believes to be deceased. But the Credit Bureau Defendants do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also

on the Death Master File before selling a credit report about said consumer, or at any time.

39.     The Credit Bureau Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

40.     The Credit Bureau Defendants fail to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

41.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

42.     Even in instances where the purportedly deceased consumer communicates directly with the Credit Bureau Defendants, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

12

43. Once a "deceased" mark is placed upon a consumer's report, the Credit Bureau Defendants will not calculate and will not provide a credit score for that consumer.

44. Upon the Credit Bureau Defendants' reports with a "deceased" mark sold to third parties, the Credit Bureau Defendants never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

45. The Credit Bureau Defendants know that third party credit issuers require a credit score in order to process a given credit application.

46. The Credit Bureau Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

47. The Credit Bureau Defendants know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

48. The Credit Bureau Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Credit Bureau Defendants are inaccurately reporting them as "deceased" and without a credit score.

49.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants had erroneously marked them as "deceased" on their credit reports.

50.     The Credit Bureau Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

51.     Nevertheless, the Credit Bureau Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

52.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

53.     The Credit Bureau Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

54. Nor do the Credit Bureau Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

55. For years after a consumer's actual death, the Credit Bureau Defendants will continue to sell credit reports about that consumer.

56. The Credit Bureau Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

57. The Credit Bureau Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

58. The Credit Bureau Defendants profit from the sale of reports on deceased consumers.

59. The Credit Bureau Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

60. The Credit Bureau Defendants know that truly deceased consumers do not apply for credit.

61.     The Credit Bureau Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Credit Bureau Defendants to be a common and major source of identity theft.

62.     The Credit Bureau Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

63.     The Credit Bureau Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

64.     The Credit Bureau Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

65.     The Credit Bureau Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for

16

purchasing or using a (supposedly) deceased consumer's credit history and/or report.

66. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Credit Bureau Defendants to sell their credit reports, absent a court order.

67. The Credit Bureau Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Experian Reports Plaintiff Deceased in or around March 2022

68. In or around March 2022, Plaintiff learned that Experian was reporting him as deceased.

69. Specifically, Experian was reporting the following account with a deceased notation:

> (a)   American Express
> Account Number: xxxx-xxxx-xxxx-xxxx
> Date Opened: March 24, 2021
> Responsibility: Deceased
> Payment Status: Consumer reported as deceased

70. Experian's reporting was grossly inaccurate: Plaintiff was not, and is not, deceased.

71. Experian's deceased reporting was patently inaccurate because Plaintiff is alive.

72. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's First Dispute to Experian Regarding the Inaccurate Credit Reporting in March 2022**

73. In or about March 2022, extremely shocked, surprised, and embarrassed at Experian's inaccurate reporting, Plaintiff called Experian and disputed the deceased notation that it was reporting on his credit reports.

74. During Plaintiff's phone dispute with Experian, a representative for Experian confirmed that there was a deceased notation reporting to Plaintiff's credit file in relation to one American Express account.

75. Plaintiff explained that any notation that he was deceased on his credit files was inaccurate as he was alive, evidenced by his phone dispute, among other things.

76. Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and for Experian to send him a corrected copy of his credit report.

77. Plaintiff never heard back from Experian regarding his dispute of the inaccurate deceased notation.

78. Thereafter, Experian failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

79. Experian failed to conduct a reasonable reinvestigation of Plaintiff's March 2022 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

80. Defendant AMEX violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to remove the deceased notation(s) from Plaintiff's credit file.

81. Upon information and belief, thereafter, Experian failed to correct or delete the deceased notation appearing in Plaintiff's credit report and continued to report him as deceased.

82. Rather, in or around April 2022, Experian added *another* deceased notation into Plaintiff's credit file.

83. Specifically, Experian was reporting the following account with a deceased notation:

19

(a)   American Express
Account Number: xxxx-xxxx-xxxx-xxxx
Date Opened: March 19, 2018
Responsibility: Deceased
Payment Status: Consumer reported as deceased

84. Again, Experian's deceased reporting was patently inaccurate because Plaintiff is alive.

**Plaintiff Obtains His Credit Reports and Confirms Trans Union is Reporting him as Deceased**

85. In or around May 2022, and in preparation for his anticipated mortgage application, Plaintiff viewed his Trans Union credit file.

86. Much to his shock, surprise, confusion, and frustration, Plaintiff learned that Trans Union was reporting him as deceased.

87. Specifically, Trans Union was reporting the following account with a deceased notation:

American Express
Account Number: xxxx-xxxx-xxxx-xxxx
Date Opened: March 19, 2018
Remarks: Deceased

88. Trans Union also marked the following account as "undesignated:"

American Express
Account Number: xxxx-xxxx-xxxx-xxxx
Date Opened: March 19, 2018
Responsibility: Undesignated

20

89.    Trans Union's reporting was grossly inaccurate: Plaintiff was not, and is not, deceased.

90.    Trans Union's deceased reporting was patently inaccurate because Plaintiff is alive.

91.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's First Dispute to Trans Union Regarding the Inaccurate Credit Reporting in May 2022**

92.    In or about May 2022, extremely shocked, surprised, and embarrassed at Trans Union's inaccurate reporting, Plaintiff disputed, with Trans Union, the deceased notation that it was reporting on his credit reports.

93.    Plaintiff's dispute alerted Trans Union to the fact that the deceased notation on his credit file was inaccurate as he was alive, evidenced by his dispute, among other things.

94.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and for Trans Union to send him a corrected copy of his credit report.

95.    Upon information and belief, shortly thereafter, Trans Union removed the deceased notation from Plaintiff's credit file.

96. However, Trans Union then reported "undesignated" in the "responsibility field" of *both* the March 19, 2018 and March 24, 2021 American Express accounts.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

97. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

98. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. E-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. E-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

99. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

100. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

101. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will

22

ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

102. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

103. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

104. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

105. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

106. The data furnishers, like Defendant AMEX, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

107. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff Applies for a Mortgage with Cross Country Mortgage in June 2022**

108. In or around June 2022, Plaintiff began searching for a mortgage financing company to finance the purchase of a new home.

109. In or around June 2022, Plaintiff began inquiring with Cross Country Mortgage about their mortgage products.

110. In or around June 2022, Plaintiff worked with a representative at Cross Country Mortgage and discussed various mortgage options to find the mortgage terms that best suited his needs.

111. In or around June 2022, Plaintiff worked with a representative at Cross Country Mortgage and completed and submitted a credit application with Cross Country Mortgage to obtain financing for the purchase of a home.

112. The representative at Cross Country Mortgage collected all of Plaintiff's personal identification information, including his social security

number, and ordered his credit reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

**Cross Country Mortgage Denies Plaintiff's Mortgage Application June 2022**

113.   Shortly after submitting his credit application, the representative informed Plaintiff that Cross Country Mortgage was unable to approve Plaintiff for credit because the Credit Bureau Defendants were reporting him as deceased on his credit reports, and consequently, the Credit Bureau Defendants were not reporting a credit score for Plaintiff.

114.   In or around June 2022, Cross Country Mortgage denied Plaintiff's credit application based upon the contents of the Credit Bureau Defendants' credit reports sold about Plaintiff.

115.   Due to the Credit Bureau Defendants' inaccurate reporting, Plaintiff was not offered any mortgage to purchase the home he needed.

116.   Despite his best efforts, Plaintiff was unable to secure a mortgage from Cross Country Mortgage and could not purchase the house he was interested in.

117.   Ultimately, Plaintiff and his significant other purchased a smaller condo, as opposed to a house. This was because the deceased reporting rendered Plaintiff ineligible to secure a mortgage and his income could not be accounted for

in their purchasing power. Instead of both being on the mortgage, the mortgage was in Plaintiff's significant other's name only.

118. This caused tension between Plaintiff and his significant other who had hoped to purchase a house where they could raise their family and have additional space, including a yard.

119. Thereafter, Plaintiff refrained from applying for credit, despite desiring to do so, out of sheer fear that the inaccurate reporting would result in additional credit denials and harm to his credit.

**Plaintiff's Second Dispute to Experian Regarding the Inaccurate Credit Reporting in the Summer of 2022**

120. On at least one occasion in or around summer 2022, extremely shocked, surprised, and embarrassed at Experian's continued inaccurate reporting, which had ultimately caused the mortgage denial, Plaintiff disputed the inaccurate deceased notation with Experian.

121. Plaintiff's dispute again alerted Experian to the fact that the deceased notation on his credit file was inaccurate as he was alive, evidenced by his dispute, among other things.

122. Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and for Experian to send him a corrected copy of his credit report.

123. Despite Plaintiff's efforts, not until September 2022, did Experian remove the deceased notation from his file.

**Experian Reinserted the Deleted Information into Plaintiff's File**

124. Sometime in or around late-September 2022, Experian reinserted the inaccurate information that Plaintiff disputed on at least two occasions in 2022.

125. Specifically, Experian reinserted a deceased notation to Plaintiff's file in relation to the March 24, 2021 American Express account.

126. Plaintiff had previously disputed the deceased notations in 2022 on at least two occasions.

127. And upon information and belief, Experian finally deleted the deceased notations in or around September 2022.

128. However, when Plaintiff reviewed his Experian credit file in or around late September 2022, he saw that Experian was once again reporting him as deceased.

129. Experian failed to notify Plaintiff of the reinsertion in writing as required by 15 U.S.C. § 1681i(a)(5)(B)(ii) and (iii).

130. Experian reinserted the inaccurate deceased notation into Plaintiff's file in violation of 15 U.S.C. § 1681i(a)(5)(B)(i).

131. Experian failed to maintain reasonable procedures designed to prevent the reappearance in a consumer's file of information that is deleted pursuant to 15 U.S.C. 1681i.

**Trans Union Reinserted the Deleted Information into Plaintiff's File**

132. Sometime, in or around November 2022, Trans Union reinserted the inaccurate information that Plaintiff disputed in or around May 2022.

133. Specifically, Trans Union reinserted a deceased notation to Plaintiff's file in relation to the March 24, 2021 American Express account.

134. Trans Union continued to report "undesignated" in the responsibility field of the March 19, 2018 American Express account.

135. Plaintiff had previously disputed the deceased notation in May 2022. And upon information and belief, Trans Union deleted the deceased notation in response to Plaintiff's dispute.

136. When Plaintiff reviewed his Trans Union credit file in or around November 2022, he saw that Trans Union was once again reporting him as deceased.

137. Trans Union failed to notify Plaintiff of the reinsertion in writing as required by 15 U.S.C. § 1681i(a)(5)(B)(ii) and (iii).

28

138. Trans Union reinserted the inaccurate deceased notation into Plaintiff's file in violation of 15 U.S.C. § 1681i(a)(5)(B)(i).

139. Trans Union failed to maintain reasonable procedures designed to prevent the reappearance in a consumer's file of information that is deleted pursuant to 15 U.S.C. 1681i.

140. Plaintiff reasonably believes that Defendant AMEX continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff was deceased.

141. Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that he was deceased in the credit reports they each issued about him.

142. As a result of the "deceased" notation(s), the Defendants made it practically impossible for Plaintiff to obtain credit.

143. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

144. At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful,

reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

145. As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher, like AMEX here, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibility[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

146. The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

147.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; sleepless nights; and emotional distress including the mental and emotional pain, anxiety, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Experian, and Trans Union)**

148.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

149.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

31

150. On numerous occasions, the Credit Bureau Defendants prepared patently false consumer reports concerning Plaintiff.

151. Despite actual and implied knowledge that Plaintiff is not dead, the Credit Bureau Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

152. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

153. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

154. As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; sleepless nights; and

32

emotional distress including the mental and emotional pain, anxiety, anguish, humiliation, and embarrassment of credit denials.

155. The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

156. Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Experian)**

157. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

158. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

33

159. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

160. On at least two occasions during 2022, Plaintiff disputed the inaccurate information with Experian and requested that it delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, stating that he is "deceased."

161. In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

162. Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

163.   As a result of Experian's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; sleepless nights; and emotional distress including the mental and emotional pain, anxiety, anguish, humiliation, and embarrassment of credit denials.

164.   Experian's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

165.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681i**
**Failure to Prevent Reinsertion and Failure to Notify Consumer of Reinsertion and Failure to Maintain Reasonable Procedures to Prevent Reinsertion**
**(Third Claim for Relief Against Defendant Experian and Second Claim for Relief Against Defendant Trans Union)**

166.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

35

167. The FCRA mandates that if a CRA deletes information from a consumer's file pursuant to a dispute, the information must not be reinserted in the file by the CRA unless the furnisher certified that the information is complete and accurate. *See* 15 U.S.C. § 1681i(a)(5)(B)(i).

168. Further, that if any disputed information that has been deleted from a consumer's file is reinserted in the file, the CRA shall notify the consumer of the reinsertion in writing not later than five (5) business days after the reinsertion. *See* 15 U.S.C. § 1681i(a)(5)(B)(ii).

169. Further, the CRAs are required to maintain reasonable procedures designed to prevent the reappearance (or reinsertion) in a consumer's file, and in consumer reports on the consumer, of deleted disputed information. *See* 15 U.S.C. § 1681i(a)(5)(C).

170. Upon information and belief, Experian reinserted the deceased notation to Plaintiff's file in or around September 2022 after having previously deleted the same in response to Plaintiff's dispute and absent a certification of completeness and accuracy by AMEX.

171. Upon information and belief, Trans Union reinserted the deceased notation to Plaintiff's file in or around November 2022 after having previously

deleted the same in response to Plaintiff's dispute and absent a certification of completeness and accuracy by AMEX.

172.   Further, neither of the Credit Bureau Defendants notified the Plaintiff in writing within five (5) business days, much less at all, after the reinsertion.

173.   Neither of the Credit Bureau Defendants maintain reasonable procedures designed to prevent the reappearance in a consumer's file of deleted disputed information absent a certification of completeness and accuracy by the Furnisher of that information.

174.   The Credit Bureau Defendants violated 15 U.S.C. § 1681i(a)(5) by reinserting deleted disputed information to Plaintiff's file absent a certification from AMEX that the information was complete and accurate; by failing to notify the Plaintiff in writing after the reinsertion; and by failing to maintain reasonable procedures designed to prevent the reappearance of deleted disputed information absent a certification of completeness and accuracy by AMEX.

175.   As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; sleepless nights; and

37

emotional distress including the mental and emotional pain, anxiety, anguish, humiliation, and embarrassment of credit denials.

176. The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

177. Plaintiff is entitled to recover attorneys' fees and costs from the Credit Bureau Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
## 15 U.S.C. § 1681s-2b
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(Only Claim for Relief Against Defendant AMEX)**

178. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

179. Defendant AMEX furnished inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Experian and Trans Union.

180. Defendant AMEX violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Experian and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Experian Trans Union.

181. As a result of Defendant AMEX's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; sleepless nights; and emotional distress including the mental and emotional pain, anxiety, anguish, humiliation, and embarrassment of credit denials.

182. Defendant AMEX's conduct, actions, and inactions were willful, rendering it individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §

1681n.   Alternatively, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

183.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant AMEX in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: February 7, 2023.

/s/ Jenna Dakroub
Jenna Dakroub
Bar Number: 0401650
**Consumer Attorneys PLC**
8245 N. 85th Way
Scottsdale, AZ 85258
Phone: (602) 807-1525
Email: jdakroub@consumerattorneys.com

*Attorneys for Plaintiff*
Reginald Merchant

41